## S10A0220. THE STATE v. BROWN.

(697 SE2d 192)

NAHMIAS, Justice.

Roger Brown was indicted in Cobb County for murder and other crimes. He moved to suppress certain statements he made during an interview with police officers on the night of the crimes. The trial court found that Brown invoked his right to counsel during the interview, and it suppressed "[a]ny statement taken subsequent" to that invocation. The State appeals that order, and we reverse.

1. On January 18, 2008, Brown allegedly killed one victim by striking him with a hammer and injured two other victims by striking them with a hammer and pry bar. He was detained and transported to Cobb County Police headquarters. There he was interviewed by Detectives Ord and McCauley for approximately 15 minutes. The interview was video recorded and later transcribed. Because the factual context of the interview is important in deciding the legal issues presented, we recount what the video recording and transcript show in some detail.

At the outset of the interview, while Detective McCauley went to get Brown coffee, Brown launched into an explanation of the crimes, claiming that he had acted in self-defense. Detective Ord did not encourage this explanation. Instead, he interrupted Brown and started to go over an advice of rights form that first collected basic biographical data and information regarding Brown's ability to understand his rights and then set forth his *Miranda* rights, see *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966). The discussion was interrupted by Brown, who wanted to know if the victim was "alright." Detective Ord replied that the victim had been

taken to a local hospital. Brown made another statement about the crimes, saying the victim "came across two parking lots away from me you know holding a bat and stuff," before noting that he was worried about the victim. Detective Ord again did not encourage Brown to provide more information about the crimes, but instead continued reading the advice of rights form.

Detective Ord advised Brown of his *Miranda* rights, including his right to remain silent and the following detailed explanation of his right to counsel:

> You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning. If you cannot afford a lawyer one will be appointed for you before any questioning if you wish. If you decide to answer questions now without a lawyer present you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

Brown stated that he understood his rights, and then he invoked his right to counsel, saying "I want a lawyer," followed by an explanation of why he was asking for a lawyer. Detective Ord confirmed, "Ok, so you're saying you want a lawyer?" and Brown repeated, "I want a lawyer."

Immediately after that confirming statement, however, Brown asked the detective if he could "get bonded and go home." Detective Ord answered, "I don't know right at this time, ok." Brown then asked if he was being charged with anything, and the detective replied, "Well, right now, we've got a lot going on, I'm being completely honest with you . . . ." Brown interrupted to volunteer more information about the crimes, ending by saying that he wanted to tell the police the truth but would rather have a lawyer present. Detective Ord responded that "we completely understand that."

After another interruption by Brown, the detective reiterated that "we understand you want a lawyer" and offered, if Brown knew of a lawyer, to try to contact him. Brown said that he had a lawyer in Lumpkin County. Detective Ord asked, "do you want us to . . . contact him now," and Brown said that would be fine and that the lawyer's information was in his wallet. Detective Ord said, "[w]e can try to do that. The only reason I said that. . . ." Brown interrupted to say "[h]is name is Jeffery Ward." Detective Ord again stated, "[t]he only reason I said that is umm you know . . . ." Brown again cut off the detective and said the lawyer knows all about him and his family. Detective Ord then stated, "[t]he quicker we get a grasp on things the better we will be able to more accurately answer any questions

you might have."

Brown next said, "I'm worried about that feller that I got into it with," reiterated his desire to go home, and asked what he was being charged with. Detective Ord responded that, as soon as he knew, he would let Brown know. The detective then left the room to retrieve Brown's wallet from impound. When the detective returned, Brown stated several times that, if the lawyer's phone number was not in the wallet, they could contact someone at his house to get it, explaining that the lawyer "knows me very well" and "I would rather have him than anybody else."

Brown then asked how long he would "sit before [he] got bond." Detective Ord replied that he was not sure, that no warrant had even been issued for Brown's arrest and the police were in the initial stage of the investigation. Brown asked what information the police had and again began to describe the crime, saying "[w]e had a struggle." Detective Ord interrupted Brown and said:

> What I'd like to do is keep that on hold until we contact your attorney. Cause what I want to do is you've been advised of your rights, you want an attorney and I can certainly appreciate that. We don't want to do anything to circumvent your rights. Ok. But what I don't want to do is get into a dialogue within which may constitute you divulging information that you didn't necessarily intend too [sic]. Ok. If that makes much since [sic] as possible we're doing this to protect your rights that's the only reason why we aren't telling you any more details about the case. Cause if I was to say something that someone else told us, it may illicit [sic] a response from you, alright. And you have asked for your attorney to be sitting here with you, and then you guys make an educated decision together, how you want to pursue this. Ok.

Brown responded, "Yes sir," and asked when he could get a phone call and where he would go next. Detective Ord responded that it might be a while before Brown could get a phone call and that he would go to the Cobb County jail if he were charged. Brown asked again whether he would be charged with a crime, and the detective again answered that he did not know. Brown said that he appreciated how nice the detectives were being. Detective Ord said that he would try to contact Brown's attorney. Brown then volunteered that he had a criminal record and again said he was worried about the victim, asking the detective to let him know how the victim was as soon as he found out. The detective said that he would, and Brown said he

wanted to see the victim when he got out. Without any question from the detective, Brown then made his final statements about the crime. Detective Ord again did not follow up. Instead, the detectives took Brown to a holding cell, saying they would try to call Brown's attorney, and the interview ended.

In his motion to suppress, Brown contended that, once Brown asked for a lawyer, the detectives violated his constitutional rights by continuing the interview. The trial court agreed, finding that Brown stated "I want a lawyer" after being read his *Miranda* rights and concluding that he "invoked his constitutional rights to counsel at this point" and that "[a]ny statement subsequent to this request shall not be allowable as direct evidence" at trial. The State then filed this interlocutory appeal. See OCGA § 5-7-1 (a) (4) (authorizing the State to appeal a pre-trial order suppressing evidence).

2. In reviewing the trial court's suppression ruling, there are no disputed facts to which this Court must defer, because the relevant evidence was presented through the videotape and transcript and is uncontroverted. See *McDougal v. State*, 277 Ga. 493, 497 (591 SE2d 788) (2004). We therefore review de novo the trial court's application of the law to the undisputed facts. See id.

It is undisputed that Brown unequivocally invoked his right to counsel when he stated, about halfway through the interview, "I want a lawyer." (We note that Brown does not contend that he ever invoked his right to remain silent.) The trial court's ruling on that point was clearly correct, but the court erred in then summarily concluding that any statement that followed must be excluded. Instead, the law requires analysis of whether, after a request for counsel, the police subjected the defendant to *further interrogation*, and, if so, whether the additional questioning was initiated by the defendant rather than the police. See *Edwards v. Arizona*, 451 U. S. 477, 484-485 (101 SC 1880, 68 LE2d 378) (1981) (holding that, once an accused has "expressed his desire to deal with the police only through counsel, [he] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police"); *McDougal*, 277 Ga. at 498 (" 'A suspect who asks for a lawyer at any time during a custodial interrogation may not be subjected to further questioning by law enforcement until an attorney has been made available or until the suspect reinitiates the conversation.' " (citations omitted)).

In this context, "interrogation" is defined as "express questioning by law enforcement officers" or its functional equivalent — " ' "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from

the suspect." ' " *Cook v. State*, 270 Ga. 820, 825 (514 SE2d 657) (1999) (quoting *Arizona v. Mauro*, 481 U. S. 520, 526-527 (107 SC 1931, 95 LE2d 458) (1987) (quoting *Rhode Island v. Innis*, 446 U. S. 291, 301 (100 SC 1682, 64 LE2d 297) (1980))). "The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Innis*, 446 U. S. at 301.

Our application of these principles to this case starts with the recognition that Brown was voluble throughout the interview. The record of the interview reveals that Brown repeatedly initiated conversation and interrupted the detectives to discuss various topics, including his concern for the victim and his account of what had happened at the crime scene. At no point in the interview, however, did the detectives expressly question Brown about the crimes, even after Brown invited such discussion by beginning to talk about them. Probably because Brown cannot point to a single police question about the crimes, he instead contends that the detectives kept him "in an interrogation posture" after he invoked his right to counsel and engaged in the functional equivalent of interrogation. We disagree.

The record of the interview shows that, after Brown invoked his right to counsel, the detectives' words and actions were of two types. Detective Ord answered, or deflected, a number of direct questions from Brown regarding what he would be charged with, when he could go home, whether he would be arrested, when he could use the phone, how the victim was doing, and where he would go next. Such responses do not constitute interrogation or its functional equivalent. See *Walton v. State*, 267 Ga. 713, 718 (482 SE2d 330) (1997) ("[A]n accused's response to an officer's answer to a question posed by the accused is not the product of custodial interrogation"); *United States v. Briggs*, 273 F3d 737, 740-741 (7th Cir. 2001) ("A police officer's response to a direct inquiry by the defendant does not constitute 'interrogation.' ").

The detectives' other statements and actions were aimed at *effectuating* Brown's invocation of his right to have counsel present before questioning. Thus, Detective Ord tried to help Brown contact the attorney who had represented him in the past and whom he preferred — the lawyer Brown said he "would rather have than anybody else." Detective Ord also cautioned Brown not to speak without his attorney present.

Although Brown does not even mention it in his brief, the dissent seizes on one comment by Detective Ord, asserting that it is "clearly an express conditioning of answers to Brown's earlier questions concerning potential charges and bond upon his making an uncounseled statement about the crimes, which the detectives should have known was reasonably likely to cause Brown to make an

incriminating statement." Dissenting Op. at 482. As noted previously, at one point after Brown invoked his right to counsel, Detective Ord said that, "[t]he quicker we get a grasp on things the better we will be able to more accurately answer any questions you might have." The dissent, however, has taken this statement out of context and misinterpreted it. The statement came after Brown had invoked his right to counsel but continued to ask the detectives questions about when could he get bond and whether he was being charged, and as Detective Ord began trying to find out if Brown had a lawyer whom he wanted to contact. In full context, it is clear that the detective was not bargaining answers for information about the crimes, but rather explaining that he would be better able to answer questions about issues like bond and charges after contacting Brown's lawyer, which is consistent with Brown's request for such counsel. We note in this respect that Brown volunteered one statement about the crimes between the point he invoked counsel and the point that Detective Ord made this remark, and Brown did not make his next and final extended statement about the crimes until several minutes after the detective's remark.

If there were any doubt that the detectives were not seeking subtly to elicit incriminating information from Brown, and that Brown could not reasonably believe that the detectives were doing so, it is eliminated by Detective Ord's firm rejoinder after Brown asked what information the police had about the crimes and then began again to discuss the incident, saying "We had a struggle . . . ." Detective Ord interrupted Brown, reminded him that he wanted an attorney and "[w]e don't want to do anything to circumvent your rights," explained that "what I don't want to do is get into a dialogue within which may constitute you divulging information that you didn't necessarily intend too [sic]," and reiterated that he did not "want to [e]licit a response from you" and "the best thing to have happen is for your attorney to be sitting here with you, and then you guys make an educated decision together." The dissent ignores this portion of the record, which is about as clear a demonstration as could be of a law enforcement officer respecting the right to counsel, rather than one seeking to circumvent the law. And Brown's principal post-invocation admissions about the crimes came *after* this rejoinder. For these reasons, we cannot conclude that the words and actions of the Cobb County officers after Brown invoked his right to counsel were "reasonably likely to elicit an incriminating response" from Brown. See *Innis*, 446 U. S. at 302.

Finally, although the detectives remained in the room with Brown for a few minutes after he invoked his right to counsel, the record of the interview unequivocally shows that they did not engage in any coercive conduct by doing so. Brown cites no authority for the

proposition that police officers must immediately leave a defendant's presence after the invocation of *Miranda* rights. To the contrary, the controlling case law excludes from the "functional equivalent" of interrogation those police statements and actions " " ""normally attendant to arrest and custody."" " *Cook*, 270 Ga. at 825 (citations omitted). After a suspect invokes his rights, the police may be in a situation where they choose to, and appropriately and safely can, leave the suspect, but in other situations the police may need to transport the suspect from the crime or arrest scene to a detention center, or from an interrogation room to a detention center, or arrange for the suspect to contact his lawyer or family, or deal with other logistical issues. See, e.g., *McGowan v. Miller*, 109 F3d 1168, 1170-1171, 1175 (7th Cir. 1997) (rejecting the argument that, after McGowan invoked his right to counsel at the house where he was arrested, the arresting officers' ride with him to the police station and stop for soft drinks on the way "was a deliberate effort to continue interrogation tactics," where the record showed that McGowan re-initiated the conversation about the case with one officer while the other officer went inside to get the drinks).

In its discussion of this issue, the only authority the dissent cites is *Griffin v. State*, 280 Ga. 683 (2) (631 SE2d 671) (2006), with the parenthetical "right to remain silent scrupulously honored when investigator immediately stopped interview and physically exited room." Dissenting Op. at 482. But that fact about the investigator's actions in Griffin was mentioned only in passing, and that case did not involve an *Edwards* issue, see 280 Ga. at 685 ("*Edwards* is not applicable here."); thus, the Court did not suggest, much less establish, a constitutional rule requiring the police to immediately leave the suspect's presence if he invokes his right to counsel. To the contrary, if law enforcement officers were required to physically stay away from a suspect after a request for counsel, the rule set forth in *Edwards* and applied in dozens of our and other courts' cases would be unnecessary, as those cases should have been decided based on whether officers remained around to hear the suspect's post-invocation admissions rather than on whether officers elicited the admissions. The many cases upholding the admissibility of such post-invocation statements as unsolicited disprove the rule the dissent would use to suppress Brown's statements.

The record in this case does not suggest that the detectives prolonged the interview in an effort to extract incriminating information from Brown. Instead, the detectives remained in and around the room (including leaving to look for the lawyer's card) for less than eight minutes after Brown asked for a lawyer. During that time, they dealt with the issues of contacting his lawyer, answering his questions, and arranging the logistics that arise when a suspect has

been taken into custody. In fact, the record demonstrates that the detectives created a non-badgering, non-coercive atmosphere during the entire interaction, prompting Brown to say near the end of the interview, "I appreciate you guys being real nice." Under these circumstances, we cannot conclude that the detectives' mere continued presence in the room constituted the functional equivalent of coercive interrogation. See *Montejo v. Louisiana*, ___ U. S. ___ (129 SC 2079, 2085, 173 LE2d 955) (2009) ("The *Edwards* rule is 'designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights.' " (citation omitted)); *Mauro*, 481 U. S. at 529-530 ("In deciding whether particular police conduct is interrogation, we must remember the purpose behind our decisions in *Miranda* and *Edwards*: preventing government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment.").

In summary, once they took Brown into custody, the Cobb County police had an obligation to advise him of his *Miranda* rights, which they did. They also had an obligation to stop interrogating him after he unequivocally invoked his right to counsel, which they did. The police were not obliged, however, to stop listening to what Brown chose to say or to immediately leave the room so that they could not hear him. See *Tennyson v. State*, 282 Ga. 92, 93 (646 SE2d 219) (2007) (" 'There is no burden on State officials to prevent (a) defendant from talking about the incident if he wishes to do so. Simply stated they must not interrogate but they need not refuse to listen.' " (citation omitted)). Brown's admissions were not elicited by interrogation, much less coerced, and they are therefore admissible at trial. See *Cook*, 270 Ga. at 826 (" 'Far from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable.' " (quoting *United States v. Washington*, 431 U. S. 181, 187 (97 SC 1814, 52 LE2d 238) (1977))).

For these reasons, we hold that the trial court erred in suppressing the statements that Brown made after he invoked his right to counsel.

*Judgment reversed. All the Justices concur, except Hunstein, C. J., and Benham and Hines, JJ., who dissent.*

HUNSTEIN, Chief Justice, dissenting.

Because I disagree with the majority's conclusion that Brown was not subjected to interrogation after unequivocally invoking his right to counsel, I must respectfully dissent.

In the context of an alleged violation of the Fifth Amendment right to counsel under *Edwards v. Arizona*, 451 U. S. 477 (101 SC 1880, 68 LE2d 378) (1981), " 'any words or actions on the part of the police (other than those normally attendant to arrest and custody)

that the police should know are reasonably likely to elicit an incriminating response from the suspect' [*Rhode Island v. Innis*, 446 U. S. 291, 301 (100 SC 1682, 64 LE2d 297) (1980)]" constitute questioning or interrogation. *Walton v. State*, 267 Ga. 713, 717 (4) (482 SE2d 330) (1997).

> [T]he [United States] Supreme Court has made clear that "(i)n deciding whether particular police conduct is interrogation, we must remember the purpose behind [its] decisions in *Miranda* and *Edwards*: preventing government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment." [Cit.]

*Cook v. State*, 270 Ga. 820, 825-826 (2) (514 SE2d 657) (1999). Although the detectives here did not question Brown in the traditional sense, they should have known that their actions, or lack thereof, after Brown invoked his right to counsel were reasonably likely to elicit incriminating statements from him. The majority relies on the fact that the detectives' behavior was polite rather than overtly coercive, but it is "the coercive nature of confinement" itself that is at issue. See id.

The majority states that, in context, a detective's comment to Brown that "[t]he quicker we get a grasp on things the better we will be able to more accurately answer any questions" did not constitute "bargaining answers for information about the crimes." Maj. Op. at 478. However, the context of the comment was as follows:

> DETECTIVE: ... We understand you want a lawyer, if you would like, if you have a lawyer that you know of, we can try to ...
> BROWN: I do but he is [in] Lumpkin County.
> DETECTIVE: OK, do you want us to [try] and contact him now umm ...
> BROWN: If you got my wallet, if you want to bring it in here. If you would like to try to, yeah that would be fine.
> DETECTIVE: We can try to do that, the only reason I said that ...
> BROWN: His name is Jeffery Ward.
> DETECTIVE: The only reason I said that is umm you know ...
> BROWN: He's done my cases before. He knows all about me, he's known me for about eight to nine years now and he knows all my family.

DETECTIVE: The quicker we get a grasp on things the better we will be able to more accurately answer any questions you might have.

This comment is clearly an express conditioning of answers to Brown's earlier questions concerning potential charges and bond upon his making an uncounseled statement about the crimes, which the detectives should have known was reasonably likely to cause Brown to make an incriminating statement.

Moreover, after Brown made his unequivocal request for counsel, several minutes elapsed before the detectives left the room to obtain the attorney's contact information; from the time Brown located the attorney's card in his wallet until the detectives left the room again to attempt to contact the attorney, several more minutes passed. As these delays on the part of the detectives could have been construed as demonstrating a lack of intent to comply with Brown's request for counsel, they were reasonably likely to cause Brown to make an incriminating, uncounseled statement. See generally *Griffin v. State*, 280 Ga. 683 (2) (631 SE2d 671) (2006) (right to remain silent scrupulously honored when investigator immediately stopped interview and physically exited room).

As the record supports a finding that Brown was subject to police questioning after his unequivocal invocation of the right to counsel, I would affirm the trial court's grant of Brown's motion to suppress.

I am authorized to state that Justice Benham and Justice Hines join in this dissent.

DECIDED JULY 5, 2010.

*Patrick H. Head, District Attorney, Dana J. Norman, John R. Edwards, Assistant District Attorneys, Thurbert E. Baker, Attorney General*, for appellant.

*Jack J. Menendez*, for appellee.